First three and then take a brief recess and then finish with the final two. We'll begin with Texas v. EPA. Mr., uh, you can pronounce your name for us. Holmes. Mr. Holmes. Yes. Good morning. Good morning. May it please the court. John Holm for Texas and the Texas Commission on Environmental Quality. EPA's disapproval of Texas' implementation plan for exported emissions under the 2008 ozone ambient standard was unlawful because EPA imposed non-statutory requirements and it violated fundamental fair notice principles of administrative law by basing that disapproval on EPA's later developed methodology that Texas didn't have at the time it had to submit its plan. Don't you also have the fundamental flaw that they waited way too long under the statute? Yes, that is another issue that the EPA did as I'll be discussing today. EPA had a deadline under the statute to disapprove that plan. It took several years. And they're supposed to do it within one year, right? They're supposed to do it in one year. And what the facts here show is rather than disapproving or approving that plan within one year based upon its own merits, EPA sat on that plan for several years. What case do you have that's failing to meet the 7410 deadline means that EPA lacks power to do anything with your SIF? That's not our contention that they lack power, but we think it's significant here that what EPA did after sitting on the SIF for so many years is it actually first proposed its own replacement plan. Right. But this is moving to the FIP and the timing of that. Just is there any authority if they're delayed on the deadline, is there authority to suggest that they wouldn't ultimately still have to comply with the statute and review what you submitted? They have to do that, don't they? Yes, and we certainly don't contend that that plan was deemed admitted because EPA missed the deadline. Right. What they did during the delay is it appears prepare their own replacement plan rather than assessing Texas's plan on the merits. Okay. But ultimately we have a ruling by them denying your petition saying that the plan, your plan, is facially deficient, not ministerial. It just didn't comply with statutory requirements. That is what they say in that disapproval. Yeah. There are some problems with all of the stated grounds for that disapproval. But just so we don't leave the deadline issue, by not acting, even if that were erroneous, how did it harm you? Because it meant Texas's determination it didn't have to impose any more controls continued. It makes sense to me you wouldn't move to compel because you don't want, you don't think you need any more emission controls. Right, right. So there's no harm. Right, based upon our technical analysis. The harm here is that if EPA had complied with its deadline and disapproved the plan, Texas could have had an opportunity to come back in and revise that plan. But they still gave you notice and opportunity. You didn't take them up, did you? Well, they gave us notice and opportunity, but they only disapproved our plan after they had already proposed their own federal plan. Okay. So the argument here is the interaction between the SIP and the FIP. Yes. Okay. Wasn't that also the case in EME Homer? It was coming up from the D.C. Circuit, denial of a SIP. That was a case involving EPA's promulgation of a FIP and some associated. Right, but the district court, the circuit decision that was reversed was as to notice in a SIP. Right? It involved the disapproval of SIPs. Right. Yes, but the ultimate issue there that the Supreme Court decided was whether EPA had exceeded its authority in the particular approach it took in the FIP. Yeah. So you have two arguments, as I understand it, on the merits. One is lack of notice, and I want to hear you on that, but how is that argument not foreclosed by EME Homer? Language by the Supreme Court like EPA has no obligation to provide information of any kind as to the good neighbor obligation. Nothing in the statute obliges that it give metrics to the states in advance. Well, we're not arguing that we certainly acknowledge that holding in the EME Homer case, we're not arguing that Texas's plan should have been approved because EPA had refused to supply any guidance. We're arguing that Texas's plan needed to be assessed on its merits, and the situation here was that although Texas had asked for feedback on its proposed plan, it had actually put it out for state notice and comment as it's required to do. Although it had asked EPA for some guidance as to what EPA wanted states to include in their state plans, EPA provided nothing. And even after Texas provided its plan to EPA, as I said, it was several more years before EPA actually got around to disapproving it. Okay. I guess my concern about this one, and we have a little bit of a time warp here because we've got a companion case that has to do with Texas's compliance with the 2015 standards, but we're looking way back in history to the 2008 standards, right? Right. And that case is still pending in front of us, the later case. The later case was argued in December 2023. Do you have a position on how the two cases interact? Because the government had said maybe consolidate them. We believe those two cases need to be decided independently on their own merits. The situations were different with regard to the 2008 standard and the 2015 standard. Your SIP in the 2008 is considerably smaller, but it predated EME Homer, correct? Yes. It was submitted before the Supreme Court decided EME Homer. So I guess why isn't this case, why isn't EPA correct denying your SIP simply for facial errors in that there was absolutely no analysis as to whether or not Texas's emissions interfered with states like Colorado that may have been maintaining air quality standards. There's just no analysis at all in the SIP of that statutory requirement. Am I wrong about the factual premise? Yes. There is analysis in it? There is discussion of both attainment and non-attainment areas in the SIP. Okay. I've got it here. Where do you discuss in the analysis portion whether Texas's emissions interfere with maintaining air quality states like Colorado? Ages 2.5 and 2.6. Okay. I'm looking at that. Of the SIP, there is a discussion of and some data regarding attainment and non-attainment areas. Okay. But what about states that are maintaining, not at the attainment issue, that are maintaining air qualities? Where is the discussion of that? There's discussion of the fact that, overall, ozone levels are declining, both for attainment and non-attainment areas. Okay. But where is the discussion of maintaining, states that maintain? Let's say Denver is maintaining air quality, but all of a sudden you've got Texas emissions going up, getting caught by the Rockies, and suddenly making what they've maintained to not. Where is discussion that that won't happen? Well, read it to me. Read it to me. Well, I guess it is a technical document. Yeah. And the overall gist of what Texas is saying here, in the absence of any guidance from EPA as to the type of analysis. Okay. Wait a minute. I'm just going to interrupt because time is precious. You're saying it's a technical document, overall gist, non-guidance. All I'm asking to you is read from the two pages you directed me to where it talks at all about any state that is maintaining air quality. Where is discussion of that? It's in the chart. It's in the chart. So not on those two pages. The data. The data is in the chart. There's data. But where is the analysis of the data? The analysis of the data is included in the portion of the SIP that discusses overall declining trends in ozone. And it does discuss both attainment and non-attainment areas together. But it does independently, contrary to what EPA is arguing in this case, it does address the non-attainment issue as best Texas could, given the fact that EPA. I do see discussion. I agree. I see discussion of non-attainment. It looks to me like it's a fairly subset, small, adjacent areas. But I see no discussion or analysis of any data relating to any place in the United States, adjacent or non-adjacent, that might be maintaining air quality. The discussion is on those pages. Can you quote it to me? I can't quote a specific sentence there. But the discussion of the trend data, the discussion of overall declining trends in ozone is what Texas provided in response in order to satisfy the good neighbor requirement. I see my time has concluded. You've saved time for about Mr. Holm. Thank you. Yes. Mr. Goodyear? Thank you, Your Honor. May it please the Court. Stephen Goodear for Intervenor Luminant Generation, supporting Texas. I'd like to address two topics. First, our motion to strike, and second, EPA's request for remand without vacature. But I'd first like to address Judge Higginson's question about EME Homer. EME Homer did not involve SIPs, SIP approvals, or SIP disapprovals. If you look at the D.C. Circuit decision, it's very clear that those disapprovals were part of different cases that were not part of that appeal. And if you look at the Supreme Court decision at page 514, including footnote 15, you'll see that the Supreme Court explained that SIPs and FIPS are different and that they're judged differently. And that case was only about FIPS. Okay. Let's step back then. What is the scope of review? Would you agree or not that the EPA can't ignore science? So if science has matured, they've still got to apply it. We're not just talking about updated data here. What we're talking about in this case, the documents that we moved to strike, which are the only record evidence regarding the plan, are from that federal docket. Those are EPA's decision about what are significant emissions using thresholds and limitations from the federal plan. Those are not federal. Those are not requirements for state plans. This is on the motion to strike. Do you have a case that says we would ever strike a document that actually is in the administrative record? The record is only supposed to contain all of your cases that talk about things that are relevant to the agency's decision. We cite them in our motion. Those are things that belong in the record. But I'm asking you a question. Do you have a case that says when a document is in the administrative record, we would still strike it from the record on appeal? Do you have a case that stands for that proposition? No. We cite in our motion cases where the administrative record is supposed to contain only relevant information, and that's not relevant information. If it is relevant, if the agency did, in fact, rely on it, which I think is what your question is going to, then it's unlawful because it shouldn't have because it's a federal plan that uses triggers and thresholds and emission limits. It's not just the data. It's not just modeling. And so EPA has gone back and forth on whether they actually did rely on these documents or not. In response to our motion, they conceded that it did constitute part of the agency's basis for taking the challenge to action and were openly relied upon the agency. That's from their motion. In their brief, they now say, well, EPA did not rely on the challenge documents. It's our position that both can't be true and that either way, the disapproval is unlawful. Either EPA relied on the documents and it shouldn't have and they can stay in the record, or EPA didn't rely on the documents and there's zero technical information in the record to support its decision. And I would point this Court to its recent published decision in another Texas v. EPA case, 122 Fed 4th, 1008, where the Court held that absent record evidence to support a SIP disapproval, EPA's disapproval is arbitrary and capricious. If the technical data, the science has changed as to attainment or maintaining, you would agree EPA has to apply that. Well, I think the question then is, is it harmless error or not? I think that's really the government's only argument and I think that's why. Well, why? I mean, if EME Homer's logic does apply to SIP review, if it does apply, that would be opposite to your proposed interpretation. I guess I'm not sure what you mean, what part of EME Homer. Well, I read it aloud a second ago. Nothing in the statute obliges that EPA provide metrics to the states. Absolutely. And they shouldn't provide metrics to the states. And the metrics are the ones in the federal plan from the record materials that we're moving to strike. They don't have to and they shouldn't have to because it's not a SIP review. But it says information of any kind. In other words, the science, what I understand EPA to have done is they're looking and trying to figure out, okay, we were forecasting in 2017 these areas will not be attaining. We've got to just address the science and be able to. It's not just they're not attaining, it's that they're significant contribution. And that is a loaded term from EPA's federal plan with all of their emission thresholds and all of their determinations that they're not entitled to make for a state plan. But the contribution, that's a term in the statute. That's what Congress told EPA to do. Make sure Texas isn't contributing to existing nonattainment and then forecasted nonattainment. That's where you have difficulty, right? What Congress said is for states to draft a plan to not significantly contribute. The delegation of authority is to the states. But then what review is there? Are you saying it's just ministerial, you've got to stamp it? No, if EPA was wrong, if Texas was wrong, if they could find some actual data that said, oh, no, this monitor said this or this monitor said that. Right, but what if Texas doesn't even do it? They don't even say, oh, look, you're maintaining areas. They don't even address the statute. It would be incomplete and it should have been addressed at the completeness criteria off the bat. I thought that's what they're saying. This is facially deficient because it's incomplete. I guess we'll hear from them in a minute. Well, completeness was decided long ago. They decided it was complete. And that was the time to point out any omissions at that time. But they didn't do that and it was deemed complete by operation of law. I would point this court, if I may have just 30 seconds, Your Honor. I asked a lot of questions. I'm expecting he'll say yes. That's fine. 30 seconds. On the harmless error question, I think that's what you'll hear about today, that reliance on the federal plan was only harmless error. I would just point the panel to United States v. Johnson, 632, Fed 3rd, 912. Under this court's precedent, it is the absence of prejudice that must be clear before applying harmless error. And given that up to 80% of the federal register is discussing the federal plan and the metrics from that federal plan, there's no way that EPA can meet the harmless error standard here. Thank you. All right. Thank you, Mr. Chair. Ms. Lee? Good morning. May it please the Court. Jin Hyung Lee on behalf of the United States Environmental Protection Agency. With me at counsel's table are my DOJ co-counsel Sarah Isfar and Rosemary Caban and Daniel Schramm of EPA's Office of General Counsel. I will spend 12 minutes explaining why EPA, under its SIP review authority, reasonably disapproved Texas' plan based solely on the information Texas provided, based solely on the information Texas had available to it when it submitted its plan to EPA for review. Those points correspond to Arguments 1 and 2 of our brief. Ms. Isfar will address the remaining issues, which were the majority of the arguments that we've heard so far, which include EPA's modeling and Texas' procedural delay arguments. Before I begin, just to address Judge Higginson's question regarding the 2023 case pending before this court, we agree with Texas that the cases should be decided separately. They have two different administrative records. This case has been fully briefed, and so this court can and should decide this case without waiting for a decision on the 2023 one. In your brief, you'd said we ought to consolidate because there were overlapping issues of law and fact. I don't believe we said we used the word consolidate, Your Honor, but we suggested that it would be beneficial for the same panel to hear both cases because there are certain overlapping issues in that both cases relate to the ozone standards. But if there are overlapping issues of law and fact, are you— I don't think there's any overlapping issues of fact, and I'm not sure we said that in our— I think you did, but anyway. Anyway, go ahead. Go on with your argument. And so as to EPA's SIP review authority, the parties agree on the key point, which is that Congress directed EPA under 42 U.S.C. 7410K3 to evaluate whether state plans, quote, meet all applicable requirements of the Clean Air Act. And so EPA lawfully disapproves the state plan if it provides reasoned explanations as to why the plan did not meet the requirements. Here, EPA did so. And so the question before this court is, did EPA provide reasoned explanations as to why Texas' plan did not meet the requirements of the Good Neighbor Provision? And here EPA provided three reasons as to why the plan did not meet the plain text requirements of the Good Neighbor Provision. While there was a discussion on what EPA did in terms of the completeness determination, that's simply a box-checking rule where EPA ensures that it has information to substantively- So what are the three deficiencies? Are you saying it was facially deficient? Are you saying Texas gave you bad science? We're saying it was facially deficient, but it was also technically deficient. And so the first reason is that SIP submissions must have permanent enforceable control measures. That's 42 U.S.C. 7410A. What Texas did, however, was rely on an invalid federal emissions control measure called CARE to address its good neighbor obligations. But the D.C. Circuit in 2008, this is three years before Texas submitted SIP, that court held that CARE was fundamentally flawed. It was insufficient to address states' good neighbor obligations for the 1997 ozone standards. And so EPA reasonably disapproved Texas' plan on that basis, and this court can and should deny the petitions for review on that basis as petitioners and interveners forfeited this issue by not addressing it in their opening briefs. So Texas had to look and read a D.C. Circuit decision to decide their methodology was incorrect, and EPA hadn't itself said that? No, Your Honor. Well, I guess... So Texas acknowledged that CARE was struck down by the D.C. Circuit, and so it says so in its submission. It says that it continued to rely on it because it was remanded without a vacater. It was kept in place on a temporary basis to continue the environmental benefits of CARE. So flawed methodology, discredited by the D.C. Circuit, that's one. Is there any requirement in the statute that the SIP simply didn't address? Or what are your second and third points? The second reason is that Texas failed to conduct an analysis of the maintenance prong as required by the good neighbor provisions plain text use of the word or, and the D.C. Circuit in North Carolina also addressed this issue. And in fact, Texas initially takes the position in its opening brief that it was not required to conduct a maintenance analysis because its nonattainment analysis, quote, subsumed its maintenance analysis. That's their opening brief at 37. Now Texas contends that it did conduct analysis, but as Judge Higginson mentioned, if we go to Texas's submission, it's clear that there was no analysis of the maintenance prong. Texas notes the declining ozone trends. That's on Texas's submission at 2-4. What we see there is that Texas only analyzed formally designated nonattainment areas of those closest to Texas. There is no analysis of the maintenance prong. And within Texas's brief, Texas also contends that it looked at wind pattern analysis. That's at 2-5 of Texas's submission. But again, there it's specific to nonattainment areas, two in Texas, one in Louisiana, Baton Rouge, and one in Tennessee, the Memphis area. Again, no analysis of the maintenance prong. And Texas also notes... I think what they are saying, though, is you can extrapolate. All their monitors in these limited areas are not showing a problem, and therefore it's a fair inference that there wouldn't be problems anywhere else. That may be what Texas is suggesting, but what the Good Neighbor Provision plainly requires is will states, for the maintenance prong, interfere with maintenance of the 2008 ozone acts in any downwind state. So it asks... Does that mean anywhere in the United States? Anywhere downwind? Anywhere? I mean, at the local level? In other words, what's the scope limit? Does that have to be reasonable? Well, Your Honor, I don't... This isn't... In terms of, like, what the scope is, we... For today's purposes, we're talking about just... Nothing done. The plain text of the Good Neighbor Provision. We don't have to get into, like, was this scope sufficient compared to, you know, a different scope? Because for EPA's second recent explanation for disapproving Texas's plan, was that there was no analysis. So we're not wait... Today, for this... For today's purposes, we're not waiting into, like, what amount would be sufficient, because here we haven't even gotten to having any analysis to analyze. So, for example, you know, Texas states that it analyzed 167 ozone monitors within EPA Region 6, which is the region Texas is in. Now, that analysis starts on 2-6. But if we go to that submission, it's clear that there wasn't an analysis, because what we see when we go there is a chart that lists all the ozone monitors within EPA Region 6 and their corresponding ozone levels. But which of these monitors will have maintenance problems, struggle to maintain the ozone standards? Are Texas's emissions reaching those monitors that are struggling to maintain the ozone standards? Will Texas interfere with maintenance of the 2008 ozone standards at any of these monitors? So this is the non-addressing of maintenance at all. What was your third point? Correct. The third point is that Texas's non-attainment analysis fell short of what the good neighbor provision plainly requires, which is, will states contribute significantly to non-attainment in any other state? What Texas assessed was whether it will contribute significantly to designated non-attainment areas of those closest to it. Because Texas added extra statutory limitations on what is required by the good neighbor provision as to the non-attainment prong, EPA reasonably disapproved Texas's plan on that basis. Okay. How can, I mean, this is in their brief, and so it's a loaded term, but respond to it. They say, we don't have a crystal ball. We were held, you delayed so long in reviewing to deny, you end up using 2017 data. But how could we ever predict that areas would be non-attaining as of that data when we submitted in 2012 and then you took a long time to review it? Isn't that part of their argument? That's part of their argument, but I think here Texas is conflating what EPA means by non-attainment, which just simply means exceeding the ozone standards with non-attainment area, which is a formal designation that EPA goes through to designate areas in attainment and non-attainment. And so it is actually under Texas's position that would require states to look into a crystal ball and guess how EPA will designate non-attainment areas. Because this is, because how the Clean Air Act works is that when EPA revises the ozone standards, so it did so with the 2008 ozone standards, then EPA and states have parallel obligations. So within three years, EPA must designate non-attainment areas of the 2008 ozone standards. Within that same three-year period, states must submit plans addressing their good neighbor obligations for the 2008 ozone standards. So within the normal course, states may well not know which areas are designated non-attainment areas of the 2008 ozone standards when they submit their plans to EPA for review. But that's not EPA's position. It's simply saying, looking at the plain text, Congress used the term non-attainment, not non-attainment area, which Congress used in various other provisions of the Clean Air Act. And so we're just looking outside of the formal designation process, or formal designation status. Which areas are projected to exceed the ozone standards? Is the state substantively contributing to that area's exceedances of the ozone standards? Just because your time's running out, are you or your colleague going to address EME Homer? Which one of you? My colleague will address EME Homer because... And in terms of our assessment of a SIPS denial, is there any circuit, because this is complex science, is there any circuit out there you would point to as a court that's really applied the statutory requirements well? We believe that most of the good neighbor provisions, like cases, have been addressed, or most of them that have been raised, have been addressed by the D.C. Circuit. We cite several of them in our case, North Carolina, Wisconsin... North Carolina, Wisconsin, okay. And obviously EME Homer as well. Now, opposing counsels made a strong argument that SIPS really aren't assessed similarly to FIPS. Do you have a response to that, or is that getting into EME Homer territory? That's getting into EME Homer territory. And I think here, Your Honor, we don't have to get into exactly what kind of guidance or information EPA was required to provide, because as the three recent explanations make clear, EPA's basis for disapproval were based solely on the information Texas provided and the information Texas had available to it when it submitted its plan. North Carolina was issued in 2008. Texas was aware of it. The holdings there discuss CARE, the federal plan, and the maintenance prong. And so for those reasons, this court can and should deny the petitions for review on the basis here and not the other pieces that petitioners raise. Thank you. Thank you, Ms. Lee. Ms. Isfar? May it please the Court, Sarah Isfar for the United States. I'm going to focus my remarks on four discrete topics. But before I do, I want to reiterate what my colleague, Ms. Lee, has already said. The Court doesn't have to consider these issues. It doesn't have to wade into the issues of the updated modeling or the purported procedural defects. Texas's plan on its face was technically flawed and did not comply with the Good Neighbor provision's requirements. EPA, therefore, reasonably disapproved the submission. But because petitioners have raised these issues repeatedly, I'll address them. I'll first address why EPA's delay in acting doesn't change EPA's statutory obligation to review the submission for compliance with the Good Neighbor provision. Second, I'll explain why, in this particular case, EPA reasonably considered updated modeling to confirm that the disapproval was reasonable. Third, I'll address petitioners' incorrect assertion that the disapproval process was procedurally defective. And lastly, I'll answer any questions that the Court may have on petitioners' requested remedy, which is particularly inappropriate here given the age of this case, the fact that EPA likely could substantiate its decision on remand, and that Vaquerter would be unnecessarily disruptive. So on my first point... If it was flawed on its face, why did it take 3 or 4 years for EPA to act on it, if it was so obvious? It would have been easy to comply with the 12-month provision, wouldn't it? Your Honor, EPA doesn't dispute that it missed the deadline. It doesn't dispute that there is a statutorily prescribed deadline that it missed. That is why, under the Clean Air Act, Section 7604, there is a provision, it's called the citizen supervision, that allows a party to sue EPA when it misses a nondiscretionary deadline and compel action. That's the important part here. EPA's obligation to act on the SIP, to either approve it or disapprove it, it doesn't go away even if EPA misses the deadline. Why would the state, if it's concluded it doesn't need to add any emission control, why would they want to compel action? Why wouldn't they just wait? They're thinking the federal government's going to agree. Your Honor, I agree with you, and that is part of our argument that Texas wasn't prejudiced here by EPA's decision. But that's assuming error. You're just saying no prejudice. I guess you've conceded there's error. Well, we've conceded that EPA has missed the deadline, and that has already been litigated, and that issue is not before the court. A district court has provided a remedy, which was to issue a decision on Texas's submission by August 1, 2016. That entire procedural history is outlined in our brief. So the question before the court is, in August 2016, EPA issued its disapproval. Was that disapproval reasonable under the APA? And our position is that it was reasonable, both because the SIP How long can EPA sit on a SIP? The statute doesn't provide for it. So the statute has a particular window for EPA to act on the SIP, but the statute also contemplates that occasionally EPA will miss a nondiscretionary deadline. There's nothing in the provision that bars EPA from acting simply because it took a long time to issue a decision. And I'll contrast this. This SIP authority under 7410K3 is contrasted with the completeness determination that our friends on the other side were discussing, which is 7410K1. If EPA doesn't act on a completeness determination within six months, the SIP is automatically determined to be complete. There was a finding that they were technically complete, and I think your colleague started to say earlier that that's just sort of a check-the-box type of thing, and you started your argument by saying it was technically flawed. So I'm not understanding how all of these terms are supposed to work together. So the way the statute works is that Texas is charged with submitting or developing and preparing and submitting a plan. Once the plan is submitted, EPA has to review for completeness within 60 days. And if it doesn't do so within six months, the SIP is deemed automatically complete. And if you look at the statute, all that completeness determination means is that the minimum criteria is met so that EPA's SIP review window is triggered. So all that means is that now EPA's got to make its decision within 12 months. And if you look at the kind of criteria that they have to submit, it's very much administrative and ministerial. It's like, does Texas have enough? Does Texas have the legal capacity to enact adequate provisions? Has there been notice and comment? That sort of thing. It's not a substantive determination as to whether the SIP is adequate or not, and the completeness determination certainly doesn't limit EPA's SIP review authority. So it was technically complete. Tell me why it's technically flawed. It's technically flawed because it does not comply with the statutory requirements, which is what my colleague explained, for three independent reasons. It relied on a vacated federal program, so there weren't adequate provisions to actually address the good neighbor provision. It also didn't have any analysis of the maintenance prong of the good neighbor provision, and its non-attainment analysis was incomplete. Statutory deficiencies, not technical. So there are statutory deficiencies. But I do want to make clear, because petitioners have raised this issue, why it was reasonable here for EPA to have considered the updated data. And that is because that was the data that was available at the time that it made its decision, and that modeling data was relevant to EPA's decision. And while EPA did not base its determination on the modeling, it confirmed that EPA was reasonable in disapproving the SIP. I guess EPA can wait as long as it wants to wait until maybe the facts are better, right? It just can wait indefinitely, and all of a sudden, oh, look at all these new facts. Here we go. No, Your Honor. Our position has never been that EPA can manufacture a disapproval, and there's certainly no evidence in the record to suggest that there is bad faith or anything to disrupt the presumption of regularity here. EPA explained its reasons for delay. There was considerable uncertainty regarding EME Homer and good neighbor obligations and whether EPA had to define good neighbor obligations before the states were to develop their SIPs. And once EME Homer was resolved, EPA moved promptly to review the SIPs, make findings of failures where states didn't submit SIPs, and that sort of thing. But if they wait and the science, the air gets cleaner, it's going to work to either the benefit of states or not. There's no advantage either way. It's just whatever the science says. Yes, Your Honor. And EPA's position has always been that it doesn't have— Give more information. You can revise under 75. Ask for a revision under 75. Yes, Your Honor. States drive the regulatory process, and they can always submit a revised SIP, which EPA will review. Even if there's a federal plan, EPA will review it. You got a pick with 30 seconds. What issues? There's a stress about motion to strike. Do you want to quickly respond to that? That is a basic administrative law question. There's no question in the record that EPA consider that updated modeling. It wasn't necessarily a basis for its disapproval, but it should be part of the record because it is identified and explained in the record. Would EME Homer say you can look at it, even if it's new anyway? EME Homer. Time's up. We'll read EME Homer. Go ahead and answer the question. Does EME Homer have relevance, or is it a FIP-only decision by the Supreme Court? No, Your Honor. The parts of EME Homer that we cite refer specifically to the court's discussion of the statutory structure, and that's what matters here. EME Homer recognized that there are practical difficulties with complying with the good neighbor provision, but that doesn't relieve a state or the federal government from trying to give meaning to the statutory structure.  And there is nothing in the statute that requires EPA to give states another chance once they've submitted a deficient SIP. Thank you, Your Honors. I appreciate your time. Thank you, Mrs. Farr. Mr. Hall for rebuttal. EME Homer was a FIP case, and it was a FIP case that was decided by the Supreme Court two years after Texas was required to submit its plan. It's important to remember if Texas hadn't submitted a plan, it could immediately be subject to a federal implementation plan. So that deadline was not mandatory. It was mandatory. It could not do what EPA did, which was sit on the plan and wait until it had developed its own plan, and only to subsequently propose to disapprove the SIP. I'd like to focus on the reasons why EPA disapproved the plan, and in here direct the court to the proposed disapproval. Most of that disapproval notice talks about the new methodology that was only put out by EPA until 2015. There is an acknowledgment that Texas did analysis. I'd recommend the court look at that, and some discussion of these contextual reasons why they say that EPA was proposing to disapprove Texas' plan. But it's apparent from looking at that proposal that what they were really saying is Texas should have used this later developed methodology, this modeling method. It's not about simply about data, later data indicating the air was clean or not clean. It was EPA wanted Texas to use a particular method, but that method had not been made available to Texas at the time that it had to submit its proposal. So Texas applied its judgment and did a technical analysis and submitted it. I thought she was saying that the modeling was clarified as the most up-to-date scientifically in the D.C. Circuit case, North Carolina, before. Am I mixed up on the chronology? The modeling that EPA has provided has evolved over time. You would agree no matter when they've got to assess it using the most scientifically correct methodology? That would be appropriate. But here the problem is that this particular methodology that EPA decided by 2015 that it wanted to use in connection with assessing good neighbor obligations, it wasn't available at 2012. And another point here, too, is that most of this case law that we're discussing involves the latitude that the EPA has in preparing a FIP. These states have the latitude in preparing a SIP, so most of this case law really does not. They have latitude in preparing their SIP. It's their plan. But EPA has a congressional mandate to then review it. It does. And they're saying there were three flaws to it. The first one is this methodological one. And to me that does intersect with how one interprets and applies EME Homer. But the second two are these just statutory facially deficient ones. Right. And let me speak to those two. One of them was this complaint about the CARE program. That is really a red herring in this case because the fact is that CARE continued to be implemented after 2012. There were emission limits for NOx, one of the key ozone precursors. At the time that Texas submitted its SIP and thereafter. So it's not as if the CARE emission limits went away and that it wasn't appropriate for Texas to consider those. The other issue here that has been raised is the non-attainment analysis. And here I think it is clear from looking at EPA's objection that EPA is going well beyond the statute by requiring in connection with that non-attainment prong that Texas have looked at areas that were in attainment. Texas applied the plain language of the statute. It did an analysis of areas that were in non-attainment that we've discussed. This is in addition to the analysis it did and the discussion of the data relating to attainment areas. But you can't hold. You would be reading the statute contrary to its plain language to say that it requires more than looking at areas that have been designated in attainment. Texas couldn't know what areas that had been designated as non-attainment rather. All the non-attainment downwind of Texas was Baton Rouge to Memphis because that's what Texas talked about. You're saying there was no other surrounding non-attainment area? Those were the areas in surrounding states that were of concern. So that is what Texas looked at. Texas determined that its emission based upon the monitoring data. If you prevail, what's the relief? Am I right that multiple FIPs have been issued since? So let's say you prevail in this case that's now looking back at smog standards from 2008. But we've got SIPs after that and FIPs after that. If you were to win here, is there a house of cards? I guess it's sort of what's the relevance? Well, at this point, EPA has not revoked the 2008 standard. The 2015 standard is more stringent. So at this point, Texas needs plans for both. So this case remains. But let's say you win in our case. What's the effect on the other companion cases I keep calling? On the 2015 case?  I think those two cases are independent. Totally independent. Independent analysis in terms of the practical effect. That's something that will have to be addressed on remand. Reversal and vacating the disapproval in this case, if I may complete my answer to the question. Vacating the disapproval doesn't constitute an approval. So EPA and Texas would have to work together to figure out what impact vacating this disapproval would have upon Texas' current participation in the trading program. I see. Okay. Thank you. Thank you. Thank you, Mr. Holm. Your case is under submission.